* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Houser. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Houser with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On all relevant dates, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On all relevant dates, an employee-employer relationship existed between plaintiff-employee and defendant-employer.
3. The insurance carrier on the claim was Liberty Mutual Group.
4. Pursuant to the Industrial Commission Form 22 Wage Chart submitted by defendants, plaintiff's average weekly wage was $488.12, which yields a compensation rate of $325.43.
5. Plaintiff alleges that he sustained a compensable injury on May 7, 2004.
6. Plaintiff has been out of work beginning on May 24, 2004, and continuing through the present.
7. At the hearing, the parties submitted, a Packet of Medical Records and Bills, which was admitted into the record, and marked as Stipulated Exhibit (2), and a Packet of Industrial Commission Forms and filings, including a Form 22, which was admitted into the record, and marked as Stipulated Exhibit (3).
8. The issue to be determined is whether plaintiff sustained a compensable injury by accident on May 7, 2004, and if so, to what benefits, if any, is he entitled.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the date of the hearing before the deputy commissioner, plaintiff was forty-three (43) years of age, with his date of birth being November 1, 1961. Plaintiff did not graduate high school, but did earn his GED in approximately 1980.
2. Plaintiff first began working for defendant-employer through a temporary service in September 2002 as a forklift operator. Thereafter, following disagreement with the plant manager, Mr. Roy Poitras, in March 2003, plaintiff did not work for defendant-employer again until July 2003, when he was rehired to run mixers.
3. Regarding plaintiff's work performance, although he was written up for a safety violation, he also received compliments from Mr. Poitras and was given a raise in approximately September 2003.
4. Prior to the incident giving rise to this claim, plaintiff injured a knee while working for defendant-employer in January 2004, but did not file a workers' compensation claim. In February 2004, plaintiff underwent surgery for his injured knee performed by Dr. Peter Whitfield. Although Dr. Whitfield advised plaintiff to remain out of work for two to three weeks, plaintiff asked to be released to return to work early. Later, Dr. Whitfield recommended additional surgery, but plaintiff declined it because he was scared he would lose his job.
5. On May 7, 2004, Mr. Poitras was on vacation and another of defendant-employer's supervisors asked plaintiff to work as a forklift operator instead of performing his regular job as a mixer and an overhead crane operator. As part of the performance of this duty, plaintiff had to hook a forklift to a 5-foot diameter manhole. Plaintiff testified that he crawled in the manhole with chains that were wrapped around the forks of the forklift and hooked the chains to the inside of the manhole, and then crawled out. After crawling out, plaintiff stood up, and hit his head on the underneath of the forklift. Although he was wearing his hard hat, the impact forcibly pushed plaintiff's head and neck down towards his shoulders. Additionally, plaintiff testified that following the impact, he experienced an electrical shock type sensation through his body.
6. Prior to May 7, 2004, plaintiff had only experienced pain in the general area of his injury in his left shoulder that he believed was caused by arthritis. Subsequent to the incident on May 7, 2004, plaintiff continued to work and did not immediately seek medical attention, believing his condition was not serious. Within a day following the incident, plaintiff began experiencing pain and stiffness in his neck, but thought it was related to his work on an overhead crane, which required looking upwards. However, as his pain continued, plaintiff determined to go to his family doctor.
7. On May 24, 2004, reported to Dr. David Ward of Battleground Urgent Care. Dr. Ward practices orthopaedic medicine and diagnosed plaintiff as having an impingement syndrome of the left shoulder and a C5-6 spondylosis. Although Dr. Ward's medical records do not reflect that an x-ray was taken, he explained at his deposition that he did not believe he would make such a diagnosis without the benefit of an x-ray. Regarding the lack of a reference in Dr. Ward's records to a work related incident, Dr. Ward explained at his deposition that he had an independent recollection of a conversation with plaintiff on May 24, 2004 or May 26, 2004 about such an injury, and advised him to file a workers' compensation claim. Dr. Ward prescribed anti-inflammatory medications for plaintiff, medically excused him from work while on these medications through May 28, 2004, and referred plaintiff to Dr. Jeffery Jenkins, a neurosurgeon.
9. Prior to this appointment with Dr. Ward on May 24, 2004, plaintiff last worked for defendant-employer on Friday, May 21, 2004. On that date, plaintiff testified that he had to leave early, and that he told this to several coworkers, and a supervisor had given him permission to leave. As of the time he left work on May 21, 2004, plaintiff had already worked more than forty (40) hours that week.
10. Following Dr. Ward's recommendation that he file a workers' compensation claim, plaintiff attempted to reach Mr. Poitras by telephone on at least two occasions on May 24, 2004. Plaintiff was unsure at the hearing as to whether he had successfully left a voice message on Mr. Poitras' answering machine. Plaintiff also telephoned another supervisor and requested the he have Mr. Poitras telephone him. On May 25, 2004, plaintiff again telephoned Mr. Poitras at work. Plaintiff also telephoned Mr. Poitras' cell phone number several times, but did not get an answer until Thursday, May 27, 2004. At that time, plaintiff informed Mr. Poitras of his injury and his seeking of medical attention for his neck. Mr. Poitras told plaintiff he was terminated for not calling in even though plaintiff explained that he had been attempting to reach him since Monday, May 24, 2004.
11. At the hearing, Mr. Poitras testified that defendant-employer's policy was to terminate employees after three days of unexcused absences. However, plaintiff had more than three unexcused absences without being terminated prior to the time he was medically excused from work on May 24, 2004. Mr. Poitras also testified that he had in fact received a message to call plaintiff from Mr. Gene Boyles prior to the day he spoke to plaintiff. Additionally, Mr. Poitras admitted that plaintiff's wife might have informed him that plaintiff had a note medically excusing him from work. As for plaintiff's character, Mr. Poitras stated that he did not have a reputation for lying and that he had always had respected him.
12. On May 28, 2004, plaintiff was examined by Dr. Peter Whitfield, a specialist in orthopaedics, and a physician's assistant, Mr. Gil Clark. Because P.A. Clark was a relatively new physician's assistant, Dr. Whitfield dictated his own note as well as having P.A. Gill dictate his. After outlining some differences between his note and P.A. Clark's, Dr. Whitfield indicated that while there was a discrepancy in the histories taken, he did not feel there was a significant difference in the reports of the examinations. Dr. Whitfield's note outlines plaintiff's report of injuring himself on the job on May 7, 2004 while wearing a hard had and hitting his head against a hard object. Dr. Whitfield reviewed x-rays of plaintiff's neck, and recommended that plaintiff undergo an MRI.
13. On December 3, 2004, plaintiff was examined by Dr. Jeffery D. Jenkins upon the referral of Dr. Ward. Following the examination, Dr. Jenkins opined that plaintiff's symptoms were caused by his workplace injury of May 7, 2004 and surfaced from his C5-6 spondylosis, degenerative disc disease and radiculopathy. Although Dr. Jenkins opined that the spondylosis was a pre-existing condition, he testified that because plaintiff became symptomatic, that his symptoms were more likely than not the result of his workplace injury. For plaintiff's condition, Dr. Jenkins recommended surgery, and opined that he should be restricted in his work with limited neck motion, no lifting more than twenty-five (25) pounds, and no overhead work. Plaintiff wanted to have the surgery recommended by Dr. Jenkins but was unable to proceed with it because he lost his health insurance upon being terminated by defendant-employer.
14. At the time of the hearing before the deputy commissioner, plaintiff was continuing to experience pain, soreness, and stiffness with the pain in the back of his neck and running a quarter of the way down his back. Plaintiff was also experiencing regular migraines, had decreased arm strength, and had stopped driving due to feeling light headed and having blurry vision.
15. Plaintiff has applied for unemployment compensation and tried unsuccessfully to locate work suitable to his background and physical abilities.
16. By Order of the Commission, plaintiff was seen for an independent medical evaluation by Dr. Del Curling, Jr. on March 9, 2005. Dr. Curling has opined that to a reasonable degree of medical certainty, plaintiff has experienced an aggravation of a pre-existing condition as the result of the May 7, 2004, workplace injury and which has lead to the development of a left cervical radiculopathy.
17. Plaintiff's testimony regarding the circumstances of his injury on May 7, 2004 and in general is accepted as credible by the undersigned.
18. Based upon the credible evidence of record, defendants have not met their burden to show that plaintiff's termination was unrelated to his injury and was for misconduct or fault, for which a nondisabled employee ordinarily would have been terminated.
19. On May 7, 2004, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer.
20. As the result of his May 7, 2004 injury by accident, plaintiff has been unable to earn any wages in his former position with defendant-employer or in any other employment for the period of May 24, 2004 through the present and continuing.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On May 7, 2004, plaintiff's average weekly wage was wage was $488.12, which yields a compensation rate of $325.43. N.C. Gen. Stat. § 97-2(5).
2. On May 7, 2004, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer in the form of a specific traumatic incident. N.C. Gen. Stat. § 97-2(6).
3. Defendants did not meet their burden to show that plaintiff was terminated for misconduct or fault, unrelated to the compensable injury, for which a nondisabled employee ordinarily would have been terminated.Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228, 472 S.E.2d 397
(1996).
4. As a result of his May 7, 2004 injury by accident, plaintiff is entitled to be paid by defendants ongoing total disability compensation at the rate of $325.43 per week for the period of May 24, 2004 through the present and continuing until such time as he returns to work, or further Order of the Commission. N.C. Gen. Stat. § 97-29.
5. As a result of his May 7, 2004 injury by accident, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred. N.C. Gen. Stat. § 97-25.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following:
 AWARD
1. Defendants shall pay to plaintiff ongoing total disability compensation at the rate of $325.43 per week for the period of May 24, 2004 through the present and continuing until such time as he returns to work, or further Order of the Commission. Compensation that has accrued shall be paid to plaintiff in a lump sum. This compensation is subject to the attorney's fee approved herein.
2. Defendants shall pay for all related medical expenses incurred or to be incurred by plaintiff as the result of his injury by accident.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded herein is approved for counsel for plaintiff. From the compensation having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check thereafter.
4. Defendants shall pay the costs.
This the __ day of January, 2006.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_________________ PAMELA T. YOUNG COMMISSIONER